IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-473

Filed 19 February 2025

Watauga County, Nos. 23 JA 38-39

IN THE MATTER OF: G.B.G. & R.J.W.

Appeal by Petitioner Watauga County Department of Social Services from order entered 21 February 2024 by Judge Matthew Rupp in Watauga County District Court. Heard in the Court of Appeals 8 October 2024.

> *Parent Defender Wendy C. Sotolongo, by Assistant Parent Defender Jacky Brammer for the respondent-appellee mother.*
>
> *Attorney Anne C. Wright for the petitioner-appellant Watauga County DSS.*
>
> *Robinson & Lawing, L.L.P., by Attorney Christopher M. Watford for the respondent-appellee father.*
>
> *Guardian ad Litem Program, by Staff Counsel Michelle FormyDuval Lynch for the respondent-appellee Guardian ad Litem*

STADING, Judge.

The Watauga County Department of Social Services ("WCDSS" or "Petitioner") appeals the trial court's dismissal of its petition alleging that R.J.W. ("Rose")[1] was a dependent and neglected juvenile. Additionally, Petitioner appeals from the interlocutory order after the trial court: (1) adjudicated G.B.G. ("Gemma") a neglected juvenile; and (2) dismissed its petition alleging that Gemma was a dependent

---

[1] *See* N.C. R. App. P. 42(b) (pseudonyms are used to protect the identity of the minor children).

juvenile. After careful review, we dismiss part of the appeal and affirm the trial court.

## I. Background

Respondent-Mother ("Mother") and Respondent-Father ("Father") (collectively, "Respondents") lived together with their one-year-old biological daughter, Rose. In early 2023, the Columbus County Department of Social Services ("CCDSS") reached out to Mother and asked if her fifteen-year-old child by another father—Gemma—could come live with her and Father.[2] Mother notified CCDSS that she "was not ready, [her] house was a mess, [and that she] didn't know how to take care of [the] mental problems that [Gemma] was having." Nevertheless, Mother "consented" to this request in February 2023.

Soon thereafter, Respondents faced difficulties managing Gemma's behavior. The record reflects that Gemma would become "aggravated really easy with [Rose]," Mother, and Father. Gemma "would start throwing things[,] [s]he would not listen[,] [and] she . . . got violent with [Rose] . . . ." Mother, concerned with Gemma's behavior and wellbeing, sought assistance from Daymark Recovery Services due to Gemma being "on a lot of medications when [Mother] got her."

During the summer of 2023, Respondents arranged for Gemma to attend group therapy sessions, but "the class did not work with [their] schedule because [Gemma] didn't get home sometimes until after six . . . ." At the same time, Father battled

---

[2] Mother and Father are the biological parents of Rose, but Mother and a non-party are the biological parents of Gemma.

alcohol addiction. Mother conceded "there was yelling, there [was] name calling, . . . and that [Father] was bipolar and needed medication." Mother stated that Father "had punched walls and thrown things when he was drinking, and . . . that she ha[d] told [Gemma] over and over to stay in her room, but that [Gemma] trie[d] to get in the middle" of these altercations. Gemma also engaged in self-harm behaviors. One incident involved Gemma cutting herself with scissors, and the second incident involved cutting herself with a butterknife. In response, Mother took Gemma to the hospital for treatment.

On 5 September 2023, WCDSS received a report indicating concerns about Gemma and Rose due to Father's ongoing alcohol addiction, fighting in the home, and Gemma's mental health. On 8 September 2023, a social worker visited the home and investigated these allegations. The social worker observed that the family home was in disarray. There were piles of trash, debris blocking the back entryway, clutter making it difficult to move within the home, dirty dishes, and dead bugs in the kitchen.

Upon speaking with Mother, the social worker learned that Father consumed alcohol regularly, suffered from bipolar disorder, called Mother names, and punched holes in the wall. Father told the social worker he struggled with alcohol addiction and mental health issues, but that Mother also "had mental health issues." He stated, "he had tried everything for his drinking," but still consumed "four to five [drinks] a day and dr[ank] almost every single day." Father said "he was going to go

to detox but that he really wasn't willing to go beyond that because he needed to work and that as long as he was working[,] he would maintain sobriety." After the walkthrough and interviews, WCDSS requested that Mother place the children with a temporary safety provider, which she did.

On 11 September 2023, Mother and the social worker engaged in a follow-up discussion. According to the social worker:

> [Mother] indicated to me that she knew that things that were occurring in the home were not okay, that she had grown up in a home where there was a lot of fighting and her mom had addiction issues. And she does not want this for her kids. She knows the whole situation is not good and admits that they do need help. I thanked her for being honest with me . . . . She says that she cannot separate from [Father]. She would push him further, but at the same time, she would make sure that she and [Father] . . . will do what is needed to change the situation because she does not want to lose her children.

On 14 September 2023, WCDSS filed petitions alleging that Gemma and Rose were dependent and neglected juveniles. That same day, WCDSS was granted nonsecure custody of Gemma and Rose. On 21 February 2024, the trial court determined Gemma was a neglected juvenile, dismissed WCDSS's petition as to Rose, and dismissed the allegation of dependency as to Gemma.

With respect to Rose, the trial court's order stated:

> 5. <u>Dismissal of Petition as to Juvenile [Rose]</u>. As to [Rose], the Court concludes, as a matter of law, that [WCDSS] did not meet its burden of proof of showing by clear, cogent, and convincing evidence that the Juvenile was <u>Neglected</u>

- 4 -

or <u>Dependent</u>. The Court bases this conclusion on the following findings of fact:

- [ ] Mother and [ ] Father resided with [Rose] in a home cluttered with personal belongings. No evidence was presented tending to show that [Rose] was affected by the cluttered home or that such personal belongings created the potential of injury to [Rose].

- [ ] Mother and [ ] Father left household cleaning products on countertops and the kitchen stove. No evidence was presented tending to show that such cleaning products were accessible and/or dangerous to [Rose]. Such cleaning products are commonplace in homes in this community.

- [ ] Father testified that he suffers from alcohol addiction and entered alcohol rehabilitation twice in 2023. [ ] [Father] also testified that he no longer drinks alcohol and attends AA meetings 2-3 times per week. This testimony was uncontroverted. Furthermore, no evidence was presented showing that any alcohol consumption by [ ] [Father] affects his child, [Rose].

- Finally, [ ] Mother and [ ] Father [ ] engage in arguments in the household. Such arguments have become less frequent since [ ] [Father] has been actively engaging in alcohol abstinence and attending AA meetings. No evidence was presented showing that [Rose] was present during such arguments nor that she was affected by such arguments in any way.

As for Gemma's dependency allegation, the trial court dismissed it because: (1) Respondents "have stable housing" and have lived together "in the same home . . . for four years"; (2) Father "attempted to be a father figure to [Gemma]"; and (3) both have provided "supervision to [Gemma]" despite her "behavioral health issues."

The trial court made the following findings to determine that Gemma was a neglected juvenile:

a.  [Gemma] suffers from untreated mental health issues, and Respondents have done very little, if anything, to treat such issues.

b.  Respondent[s] . . . have been aware of [Gemma's] mental health issues since at least March 2023 without taking appropriate steps to address them.

c.  Respondents have acknowledged that [Gemma] needs inpatient treatment before she can return home.

d.  [Gemma] used scissors to cut her arms and a butter knife to cut her throat in the fall of 2023. Respondent[s] . . . did not take sufficient measures to address these issues. After this incident, [ ] Mother failed to take [Gemma] to an important mental health appointment because [ ] Mother overslept. Exacerbating matters, [ ] Mother the failed to reschedule the appointment for her daughter.

e.  [ ] Mother provided no justifiable reasons for not attending nor ensuring [Gemma] attends online appointments to address the Juvenile's mental health needs.

f.  Respondent[s] . . . have engaged in name-calling and yelling in the presence of [Gemma]. [Gemma] has attempted to break up these arguments between Respondent[s] . . . .

g.  [Gemma] has also been present when such arguments have escalated to the point where [ ] [Father] has punched walls in their shared home, causing holes in the walls. [ ] [Father] also broke an interior door during one of these incidents during which [Gemma] was present.

Petitioner entered its notice of appeal on 29 February 2024. Respondents moved to dismiss the appeal since the notice of appeal lacked the signature of WCDSS's director. Petitioner responded to the motion to dismiss and alternatively petitioned for a writ of *certiorari* ("PWC") concerning the lack of the director's signature. Respondents also moved to strike the Guardian *ad Litem*'s ("GAL") brief

for failure to timely file its notice of appeal because the GAL was, in effect, standing in the shoes of the appellant. In response, the GAL moved to disregard or strike Respondents' motion, and in the alternative, moved to align with the Petitioner.

## II.   Jurisdiction

We first address this Court's jurisdiction to consider Petitioner's appeal in view of: (1) Respondents' motion to dismiss; (2) Petitioner's PWC; and (3) whether the adjudication and dismissal pertaining to Gemma is interlocutory. For the reasons below, we deny Respondents' motion to dismiss the appeal. We also dismiss Petitioner's PWC as moot given that their notice of appeal properly conferred jurisdiction for the dismissal of the petition concerning Rose. We further decline review of the allegations pertaining to Gemma because the trial court's order is a temporary dispositional order.

"[T]o confer jurisdiction on the state's appellate courts, appellants of lower court orders must comply with the requirements of Rule 3 of the North Carolina Rules of Appellate Procedure." *Bailey v. N.C. Dep't of Revenue*, 353 N.C. 142, 156, 540 S.E.2d 313, 322 (2000). "The provisions of Rule 3 are jurisdictional, and failure to follow the rule's prerequisites mandates dismissal of an appeal. In addition, the rules of the Supreme Court that regulate appeals, such as Rule 3, are mandatory and must be observed." *Putman v. Alexander*, 194 N.C. App. 578, 582, 670 S.E.2d 610, 614 (2009) (cleaned up). Rule 3(b) provides that "[a]ny party entitled to an appeal under N.C. [Gen. Stat.] § 7B-1001(a) may take appeal by filing notice of appeal with the

clerk of superior court in the time and manner set out in N.C. [Gen. Stat.] § 7B-1001(b) and (c) . . . ." N.C. R. App. P. 3(b) (2023). Turning to Section 7B-1001, the notice of appeal "shall be signed by both the appealing party and counsel for the appealing party." N.C. Gen. Stat. § 7B-1001(c) (2023).

In their motion to dismiss, Respondents argue that Petitioner's notice of appeal is defective because it "was signed only by DSS trial counsel, DSS appellate counsel, and a social worker supervisor." Specifically, Respondents contend that "[b]ecause [Petitioner's] notice of appeal was not signed by the Watauga County DSS director, the appeal must be dismissed." Our statute provides, "[t]he director may delegate to one or more members of his staff the authority to act as his representative." *Id.* § 108A-14(b) (2023). The notice of appeal was signed by the social worker as "Supervisor and Authorized Representative of Director of Watauga County Department of Social Services." Consequently, Petitioner's notice of appeal is sufficient to confer jurisdiction on this Court for Rose's petition. We therefore dismiss Petitioner's PWC as moot.

While we have jurisdiction to address Petitioner's appeal concerning the dismissal of Rose's petition, we decline to review the dismissal of Gemma's dependency allegation since this order is a temporary dispositional order. *See* N.C. Gen. Stat. § 7B-1001(a)(3) (2023). "As a general matter, there is no right of immediate appeal from an interlocutory order, 'which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire

controversy.'" *Matter of T.E.*, 252 N.C. App. 427, 797 S.E.2d 386 (2017) (quoting *Veazey v. City of Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950)). "N.C. Gen. Stat. § 7B–1001(a)(3) specifies that an adjudication order may only be appealed along with a corresponding disposition order, which is lacking in this case." *In re P.S.*, 242 N.C. App. 430, 432, 775 S.E.2d 370, 371 (2015). *See In re C.M.*, 183 N.C. App. 207, 215, 644 S.E.2d 588, 595 (2007) ("Section 7B–1001 specifically delineates the juvenile orders that may be appealed and does not provide that a party may appeal a temporary dispositional order.").

Here, the trial court's order is captioned as the following: "ORDER ON ADJUDICATION AND INTERIM DISPOSITION[.]" Moreover, the last line of the trial court's order reads: "Next [h]earing. This matter shall be set for Disposition during the February 19-20, 2024, Juvenile Session of Watauga County District Court or as soon thereafter as it may be heard." Though the trial court disposed of Petitioner's dependency claim concerning Gemma by dismissal, it did not fully resolve that matter since the adjudication of neglect only contained an interim disposition and was scheduled for a disposition hearing. *See In re P.S.*, 242 N.C. App. at 432, 775 S.E.2d at 372. Therefore, the appeal challenging the temporary dispositional order for Gemma is dismissed without prejudice.

### III.  Motion to Strike GAL's Brief

Respondents' move this Court to strike the GAL's brief. Citing unpublished authority, Respondents contend this Court should disregard the GAL's brief because

"despite not appealing, [the] GAL is essentially operating as an appellant by tacitly endorsing [WC]DSS'[s] request for reversal of the trial court's order." However, the GAL is a party to this matter and absent reference to a violation of a specific rule or binding authority, we decline to strike its brief.

## IV.    Analysis

Having resolved jurisdiction, two issues remain for our consideration: whether the trial court committed error by (1) failing to determine that Rose was a neglected juvenile; and (2) failing to determine that Rose was a dependent juvenile. After careful review, we affirm the trial court.

"When reviewing a trial court's order adjudicating a juvenile abused, neglected, or dependent, this Court's duty is 'to determine (1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by findings of fact.'" *In re F.C.D.*, 244 N.C. App. 243, 246, 780 S.E.2d 214, 217 (2015) (quoting *In re T.H.T.*, 185 N.C. App. 337, 343, 648 S.E.2d 519, 523 (2007)). "It is well settled that in a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." *In re J.A.M.*, 372 N.C. 1, 8, 822 S.E.2d 693, 698 (2019). "Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." *In re K.S.*, 380 N.C. 60, 64, 868 S.E.2d 1, 4 (2022) (quoting *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)).

We have a two-step process for abuse and neglect petition proceedings: an adjudicatory stage and a dispositional stage. *In re K.W.*, 272 N.C. App. 487, 493, 846 S.E.2d 584, 589 (2020). "If the trial court finds at adjudication that the allegations in a petition have been proven by clear and convincing evidence and concludes based on those findings that a juvenile is abused, neglected, or dependent, the court then moves on to an initial disposition hearing." *Id.* at 493, 846 S.E.2d at 589 (citing N.C. Gen. Stat. § 7B-901 (2019)). At the dispositional stage, "the trial court, in its discretion, determines the child's placement based on the best interests of the child." *In re K.W.*, 272 N.C. App. at 493, 846 S.E.2d at 589.

## A. Neglect

Petitioner first contends the trial court erred by failing to determine that Rose was a neglected juvenile at the adjudication phase. Specifically, Petitioner asserts that Rose is a neglected juvenile and that the trial court erred by not adjudicating her as such based on: (1) "the domestic violence in the home"; (2) the fact that Gemma was adjudicated neglected and lived in the same home; (3) the fact that the trial court considered improper evidence of Father's abstention and treatment for alcohol abuse; and (4) "the unsafe conditions of the home." *See* N.C. Gen. Stat. § 7B-101(15)(e) (2023).

A neglected juvenile is:

> Any juvenile less than 18 years of age (i) who is found to be a minor victim of human trafficking under G.S. 14-43.15 or

(ii) whose parent, guardian, custodian, or caretaker does any of the following:

a. Does not provide proper care, supervision, or discipline.

b. Has abandoned the juvenile, except where that juvenile is a safely surrendered infant as defined in this Subchapter.

c. Has not provided or arranged for the provision of necessary medical or remedial care.

d. Or whose parent, guardian, or custodian has refused to follow the recommendations of the Juvenile and Family Team made pursuant to Article 27A of this Chapter.

e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare.

f. Has participated or attempted to participate in the unlawful transfer of custody of the juvenile under G.S.14-321.2.

g. Has placed the juvenile for care or adoption in violation of law.

In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

*Id.* § 7B-101(15)(a)-(g) (2023). "Our review of the numerous cases where 'neglect' or a 'neglected juvenile' has been found shows that the conduct at issue constituted either severe or dangerous conduct or a pattern of conduct either causing injury or potentially causing injury to the juvenile." *In re Stumbo*, 357 N.C. 279, 283, 582

S.E.2d 255, 258 (2003). "In order to adjudicate a juvenile neglected, our courts have additionally required that there be some physical, mental, or emotional impairment of the juvenile *or a substantial risk of such impairment* as a consequence of the failure to provide proper care, supervision, or discipline." *In re J.A.M.*, 372 N.C. at 9, 822 S.E.2d at 698 (citation and internal quotation marks omitted).

### 1. *Domestic Violence*

To support their contention, Petitioner first argues that since "Rose was in the home . . . when domestic violence was occurring," she was exposed to an "injurious environment." Yet when looking at the trial court's findings, nothing suggests that Rose was affected. Rather, the record shows that Gemma tried to intervene against Mother's wishes. *See In re Montgomery*, 311 N.C. 101, 110–11, 316 S.E.2d 246, 252–53 (1984) ("[O]ur appellate courts are bound by the trial courts' findings of fact where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary.").

The record also lacks sufficient evidence that Rose was at risk moving forward because of this activity. The findings instead indicate that "[s]uch arguments have become less frequent since [ ] [Father] has been actively engaging in alcohol abstinence and attending AA meetings." *See In re C.M.*, 183 N.C. App. at 210, 644 S.E.2d at 592 (citations omitted) ("[T]o adjudicate a child to be neglected, the failure to provide proper care, supervision, or discipline must result in some type of physical, mental, or emotional impairment or a substantial risk of such impairment."). We

therefore hold that the trial court's findings are supported by clear, cogent, and convincing evidence and its findings support its conclusion of dismissal. *See id.* (quoting *In re McLean*, 135 N.C. App. 387, 395, 521 S.E.2d 121, 126 (1999) ("Section 7B-101(15) affords the trial court some discretion in determining whether children are at risk for a particular kind of harm given their age and the environment in which they reside.").

### 2. *Differing Neglect Adjudications – Rose vs. Gemma*

Petitioner next argues that because Gemma was adjudicated a neglected juvenile, it was error not to reach the same conclusion for Rose. *E.g.*, *In re Q.A.*, 245 N.C. App. 71, 74–75, 781 S.E.2d 862, 865 (2016) (holding that the trial court erred by adjudicating only two out of five children to be neglected where they were exposed to the same injurious environment including a lack of plumbing, electricity, and food.).

Our statute provides, "[i]n determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another . . . has been subjected to abuse or neglect by an adult who regularly lives in the home." N.C. Gen. Stat. § 7B-101(15). But here, the facts surrounding Gemma's adjudication and Rose's dismissal are inherently different, especially given that Gemma was fifteen years old while Rose was one-and-a-half years old. The findings of the trial court demonstrate that Gemma suffered from "untreated mental health issues[,]" that Respondents provided no reasonable treatment, and that Gemma engaged in self-harm twice. *See In re Montgomery*, 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984)

("In determining whether a child is neglected, the determinative factors are the circumstances and conditions surrounding the child, not the fault or culpability of the parent."). Moreover, the findings demonstrate exposure to an injurious environment specific to Gemma, given that she was exposed to and participated in domestic conflicts within the home. A court "may not adjudicate a juvenile neglected solely based upon previous [DSS] involvement relating to other children. Rather, in concluding that a juvenile lives in an [injurious environment], . . . the clear and convincing evidence in the record must show current circumstances that present a risk to the juvenile." *In re A.W.*, 377 N.C. 238, 248, 856 S.E.2d 841, 850 (2021) (quoting *In re J.A.M.*, 372 N.C. at 9, 822 S.E.2d at 698). Thus, we see no similarities between Rose's and Gemma's situation that would warrant adjudicating both as neglected. *See In re A.W.*, 377 N.C. at 248, 856 S.E.2d at 850; *see also In re C.M.*, 183 N.C. App. at 210, 644 S.E.2d at 592.

### 3. *Improper Evidence – Father*

Petitioner next contends that the trial court improperly considered evidence of Father's abstention from alcohol as well as his Alcoholics Anonymous ("AA") meeting attendance when adjudicating Rose because this conduct occurred after the filing of the petition.

Adjudication hearings "shall be a judicial process designed to adjudicate the existence or nonexistence of any of the conditions alleged in a petition." N.C. Gen. Stat. § 7B-802 (2023). To that end, "the conditions underlying determination of

whether a juvenile is an abused, neglected, or dependent juvenile are fixed at the time of the filing of the petition. This inquiry focuses on the status of the child at the time the petition is filed, not the post-petition actions of a party." *In re L.N.H.*, 382 N.C. 536, 543, 879 S.E.2d 138, 144 (2022). "When, however, ample other findings of fact support an adjudication of neglect, erroneous findings unnecessary to the determination do not constitute reversible error." *In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006).

Here, the trial court found that Father suffered from alcohol addiction and entered rehabilitation twice in 2023. The record shows that Father began abstaining from alcohol following removal of the children on 8 September 2023 but was "in detox prior to [the WCDSS social worker's] initiation." In other words, the record shows Father's abstention from alcohol occurred before the filing of Rose's petition on 14 September 2023. This testimony "was uncontroverted, so the [c]ourt accept[ed] the same as fact." *In re B.S.O.*, 234 N.C. App. at 708, 760 S.E.2d at 62 (cleaned up) ("An appellant is bound by any unchallenged findings of fact."). We therefore overrule this argument by Petitioner.

### 4. *Unsafe Conditions*

Petitioner last contends that the trial court committed error by dismissing Rose's neglect petition because there were "unsafe conditions" in the home. Specifically, Petitioner asserts that the trial court erroneously determined that "no

evidence was presented tending to show that [the] household cleaning products left on countertops and the stove were accessible and/or dangerous to [Rose]."

"The trial court determines the weight to be given the testimony and the reasonable inferences to be drawn therefrom. If a different inference may be drawn from the evidence, the trial court alone determines which inferences to draw and which to reject." *In re M.M.*, 272 N.C. App. 55, 69, 845 S.E.2d 888, 898 (2020) (citation omitted).

Here, the trial court found that Respondents "left household cleaning products on countertops and the kitchen stove" and that "no evidence was presented tending to show such cleaning products were accessible and/or dangerous to [Rose]." The record contains two photographs submitted into evidence that show a bottle of bug spray on the back of the stove, a bottle of Lysol on the back part of the stove, and a bottle of Mr. Clean left on a countertop. At the hearing, the social worker who took those pictures testified "it's possible" Rose could access the cleaning products. Accordingly, the trial court's finding is supported by clear, cogent, and convincing record evidence. *See In re C.M.*, 183 N.C. App. at 210, 644 S.E.2d at 592.

Petitioner next contends that the "cluttered and dirty condition of the home" indicated that the environment was injurious to Rose. However, the trial court found that "[n]o evidence was presented tending to show that [Rose] was affected by the cluttered home or that such personal belongings created the potential of injury to [Rose]." Since the trial court was free to determine which inferences to draw from

the evidence, we see no basis to disturb this finding. *See In re K.J.B.*, 248 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) ("[I]n order for a court to find that the child resided in an injurious environment, evidence must show that the environment in which the child resided has resulted in harm to the child or a substantial risk of harm."); *see also Matter of M.M.*, 272 N.C. App. 55, 69, 845 S.E.2d 888, 898 (2020) ("[T]he trial court alone determines which inferences to draw and which to reject.").

## B. Dependency

Petitioner contends that the trial court committed error by failing to determine that Rose was a dependent juvenile. Specifically, Petitioner argues dismissal was improper because Respondents failed to provide an alternative childcare arrangement—which the trial court also failed to consider. Because the record shows that at least one parent could take care of Rose, we cannot say the trial court failed to consider whether Respondents had alternative childcare. Furthermore, Respondents are not required to provide evidence concerning an alternative child care arrangement since it is the responsibility of DSS to provide evidence they needed such arrangement and did not have one.

A "dependent juvenile" is one "in need of assistance or placement because (i) the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or (ii) the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative childcare arrangement." N.C. Gen. Stat § 7B-101(9). In determining dependency, "the trial

court must address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements." *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005). Findings of fact addressing both prongs must be made before a juvenile may be adjudicated as dependent, and the court's failure to make these findings will result in a reversal of the court. *In re K.D.*, 178 N.C. App. 322, 328, 631 S.E.2d 150, 155 (2006). For dependency determinations, "a child cannot be adjudicated dependent" if they have at least one parent capable of "provid[ing] or arrang[ing] for adequate care and supervision." *In re Q.M.*, 275 N.C. App. 34, 42, 852 S.E.2d 687, 693 (2020) (citation omitted).

Here, the trial court made findings that Mother and Father lived with Rose in a home that, although cluttered, did not present a danger to her. Likewise, while cleaning supplies were left on countertops, nothing in the record suggests these items were accessible or hazardous to Rose. Father acknowledged past struggles with alcohol and mental health; yet he testified—without contradiction—that he stopped drinking and attended AA meetings multiple times per week. The trial court determined there was no evidence "showing that any alcohol consumption by [Father] affect[ed] his child, [Rose]." Though Mother admitted arguments occurred in the home, the trial court found no indication that Rose was present or harmed by them and that these incidents diminished once Father addressed his drinking. On these facts, we glean that at least one parent was able to supervise or care for Rose. *See In*

*re Q.M.*, 275 N.C. App. at 42, 852 S.E.2d at 693. Accordingly, the trial court correctly concluded that Rose was not a dependent juvenile.

**V.    Conclusion**

We deny Respondents' motion to dismiss Petitioner's appeal as to each child. Petitioner's PWC is thus rendered moot. We also deny Respondents' motion to strike the GAL's brief. Since the trial court's order concerning Gemma's petition is a temporary dispositional order, Petitioner's appeal is interlocutory and dismissed without prejudice. Last, after considering the trial court's dismissal of Rose's petition, we affirm the trial court's disposition.

DISMISSED IN PART; AFFIRMED IN PART.

Judges ARROWOOD and WOOD concur.